JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Plaintiffs-appellants, Great Lakes Capital Partners, Ltd. ("Great Lakes") and Patrick White ("White") collectively referred to as ("plaintiffs"), appeal the trial court's granting of summary judgment in favor of defendants-appellees, Plain Dealer Publishing Co., The Plain Dealer, and The Plain Dealer, LLC (collectively as "The Plain Dealer"). Finding no merit to the appeal, we affirm.
 {¶ 2} This matter arises out of two newspaper articles published by The Plain Dealer on August 26, 2005 and November 18, 2005 ("two articles") regarding a controversy surrounding the Ohio Bureau of Workers' Compensation ("BWC") fund. To better understand this matter, some background information and the context in which the two articles appeared is necessary.
 {¶ 3} At the time the two articles were published, White was the president and chief financial officer of Great Lakes, a brokerage business, which performed work for various government entities, including the BWC.[1]
 {¶ 4} In April 2005, the public learned that some BWC funds were mismanaged and that the BWC allowed MDL Investments, one of its investment firms, to invest in a high-risk hedge fund that lost over $200 million. On August *Page 4 
25, 2005, a reporter for The Plain Dealer attended a BWC Oversight Commission meeting and learned that the Securities and Exchange Commission ("SEC") was investigating the BWC.
 {¶ 5} The Plain Dealer obtained SEC documents which revealed that: the SEC was concerned that the BWC was paying "excessive" commissions to its investment brokers, including Great Lakes; the BWC ignored the SEC's warning about the "excessive" commissions; the SEC brought the matter to the attention of the Ohio Attorney General; and the Ohio Attorney General believed that the SEC's concerns were unwarranted.
 {¶ 6} The next day, on August 26, 2005, The Plain Dealer published the first article at issue. In that article, The Plain Dealer stated that a trio of politically connected brokers, Great Lakes, U.S. Discount Brokerage Inc. ("U.S. Discount"), and Mantor Watson Securities ("Mantor"), were paid excessive fees. It also stated that Great Lakes was no stranger to investment "scandal," and the BWC allowed Great Lakes to designate its own commission. Following this article, Great Lakes' attorney corresponded with The Plain Dealer advising it that the August 2005 article was false and defamatory.
 {¶ 7} Despite this letter, The Plain Dealer published another article on November 18, 2005. In this second article, The Plain Dealer stated that Great Lakes' name surfaced in a separate investment "scandal" in New Hampshire. *Page 5 
The article also reported that New Hampshire Retirement System ("NHRS") was investigating whether its former board chairman, Ed Theobald ("Theobald"), had undisclosed dealings with Great Lakes.
 {¶ 8} As a result of these articles, the plaintiffs filed suit against The Plain Dealer in August 2006, claiming that the general public and individuals doing business with them believed that they were involved in criminal activity. The plaintiffs' amended complaint sought monetary damages for the alleged "false and defamatory statements" published by The Plain Dealer. The plaintiffs asserted claims for defamation (per se and per quod), tortious interference with business and contractual relationships, negligent misrepresentation, and fraud.
 {¶ 9} In July 2007, The Plain Dealer moved for summary judgment. The plaintiffs filed a brief in opposition and voluntarily dismissed, without prejudice, the negligent misrepresentation and fraud claims. The trial court granted The Plain Dealer's motion for summary judgment on all remaining claims, finding that the plaintiffs failed to establish that The Plain Dealer acted with actual malice and that the published statements were false statements of fact.
 {¶ 10} The plaintiffs now appeal, raising four assignments of error for our review, which shall be discussed together where appropriate.
 {¶ 11} In the first assignment of error, the plaintiffs argue that the trial court erred in granting summary judgment in favor of The Plain Dealer because *Page 6 
genuine issues of material fact remain as to whether The Plain Dealer acted with actual malice when publishing both articles. In the second assignment of error, the plaintiffs argue that the trial court erred in determining that they are limited public purpose figures.
 Standard of Review {¶ 12} Appellate review of summary judgment is de novo. Grafton v.Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241;Zemcik v. LaPine Truck Sales Equip. Co. (1998), 124 Ohio App.3d 581,585, 706 N.E.2d 860. The Ohio Supreme Court stated the appropriate test in Zivich v. Mentor Soccer Club (1998), 82 Ohio St.3d 367, 369-370,696 N.E.2d 201, as follows:
 {¶ 13} "Pursuant to Civ. R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. Horton v. Harwick Chem. Corp.
(1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Dresher v. Burt (1996),75 Ohio St.3d 280, 292-293, 662 N.E.2d 264, 273-274." *Page 7 
 {¶ 14} Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ. R. 56(E); Mootispaw v. Eckstein
(1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 358-359, 604 N.E.2d 138.
 Defamation {¶ 15} "Defamation is the unprivileged publication of a false and defamatory matter about another." McCartney v. Oblates of St. FrancisdeSales (1992), 80 Ohio App.3d 345, 353, 609 N.E.2d 216. A defamatory statement is one which tends to cause injury to a person's reputation or exposes him to public hatred, contempt, ridicule, shame, or disgrace or affects him in his trade or business. Id., citing Matalka v.Lagemann (1985), 21 Ohio App.3d 134, 136, 486 N.E.2d 1220.
 {¶ 16} A defamatory statement expressed in writing, a picture, sign, or electronic broadcast is considered libel. Garner, Black's Law Dictionary (7th Ed. 1999) 927. "Libel" is generally defined as a "`false written publication made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame[,] or disgrace or affecting a *Page 8 
person adversely in his trade, business, or profession.'" Stokes v.Meimaris (1996), 111 Ohio App.3d 176, 184, 675 N.E.2d 1289, quotingA B-Abell Elevator Co. v. Columbus/Cent. Bldg. Constr.,73 Ohio St.3d 1, 7, 1995-Ohio-66, 651 N.E.2d 1283.
 {¶ 17} To establish defamation, the plaintiffs must demonstrate: "(1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a result of the publication, and (5) that the defendant acted with the required degree of fault in publishing the statement." Bisbee v. Cuyahoga Cty. Bd. of Elections (Mar. 1, 2001), Cuyahoga App. No. 77629, quoting Pollock v. Rashid (1996),117 Ohio App.3d 361, 368, 690 N.E.2d 903.
 {¶ 18} Under the fifth element of defamation, the defendant's required degree of fault depends upon the status of the plaintiff. Celebrezze v.Dayton Newspapers, Inc. (1988), 41 Ohio App.3d 343, 535 N.E.2d 755. When the plaintiff is a private figure, the required degree of fault is ordinary negligence. Lansdowne v. Beacon Journal Publishing Co. (1987),32 Ohio St.3d 176, 512 N.E.2d 979.[2] On the other hand, if the plaintiff is a public figure, then the *Page 9 
plaintiff must show that the defendant acted with actual malice.[3]Lansky v. Rizzo, Cuyahoga App. No. 88356, 2007-Ohio-2500.
 Limited Purpose Public Figure {¶ 19} In addition, courts have created a "limited purpose public figure," which is a plaintiff who becomes a public figure for a specific range of issues from which the person gains general notoriety in the community. Gertz v. Robert Welch, Inc. (1974), 418 U.S. 323,94 S.Ct. 2997, 41 L.Ed.2d 789. In order to determine whether someone is a limited purpose public figure, the court must examine: "(1) the individual's participation in the controversy from which the alleged defamation arose, and (2) whether that individual has attained a general notoriety in the community as a result of that participation." Kassouf v.Cleveland Magazine City Magazines (2001), 142 Ohio App.3d 413, *Page 10 
755 N.E.2d 976, citing Talley v. WHIO TV-7 (1998), 131 Ohio App.3d 164,722 N.E.2d 103. Any person may become a limited purpose public figure as to public issues or controversies into which he or she injects him or herself. E. Canton Edn. Assn. v. Mclntosh (1999), 85 Ohio St.3d 465,482,709 N.E.2d 468. In order for the statement to be defamatory, a limited purpose public figure must prove that the libelous statement was made with actual malice. Kassouf.
 {¶ 20} The plaintiffs argue that they are not a public figure or a limited purpose public figure. The Plain Dealer, on the other hand, argues that the plaintiffs are a limited purpose public figure because White actively engaged in business with government entities that are subject to public scrutiny. We agree.
 {¶ 21} This court has found that individuals, by entering certain lines of work, have voluntarily exposed themselves to media attention and are considered public figures. Nussbaumer v. Time, Inc. (Nov. 6, 1986), Cuyahoga App. No. 49872. We have also found that a plaintiff who had numerous city contracts related to parking and impound lots, had recently been indicted by federal authorities, and was involved in other controversies that were written about in past articles was a limited purpose public figure because his "business activities thrust him into the center of important public controversies." Kassouf at 422.
 {¶ 22} Furthermore, when an individual undertakes a course of conduct that invites attention, even though such attention is not desirable, he may be deemed a *Page 11 
public figure. McDowell v. Paiewonsky (C.A.3, 1985), 769 F.2d 942 (where the court held that an architect was a limited purpose public figure because he accepted public projects and engaged in conduct that was likely to invite public attention and scrutiny). See, also,Kensington Land Co. v. Zelnick (C.P. 1998), 95 Ohio Misc.2d 45, 54,706 N.E.2d 1279 (where the court held that developers who repeatedly seek zoning approval from government agencies are public figures with respect to First Amendment analysis).
 {¶ 23} In the instant case, the plaintiffs' activity in soliciting and obtaining business with public agencies and retirement funds makes them limited purpose public figures. The record demonstrates that Great Lakes worked with the BWC and the Ohio Treasurer's office. More than half of Great Lakes' brokerage work was for governmental entities. The BWC was Great Lakes' largest client, and the commissions received for the plaintiffs' work were paid with BWC funds. As a state entity, the BWC's investment activity is subject to public trust and scrutiny. Thus, the plaintiffs' voluntary business activity with the BWC placed them in the midst of significant public controversy and subjected them to scrutiny from the public and the press as well. Moreover, the plaintiffs used a "spokesperson" for the media regarding the BWC scandal.
 {¶ 24} Therefore, we conclude that the trial court did not err in finding that the plaintiffs are limited purpose public figures. *Page 12 
 Actual Malice {¶ 25} Having made the determination that White and Great Lakes are limited purpose public figures, we next determine whether the plaintiffs presented clear and convincing evidence of actual malice on the part of The Plain Dealer.[4]
 {¶ 26} In Varanese v. Gall (1988), 35 Ohio St.3d 78, 518 N.E.2d 1177, paragraph one of the syllabus, the Ohio Supreme Court held that in order to establish actual malice, the plaintiff must demonstrate, with convincing clarity, that the defendant published the defamatory statement either with actual knowledge that the statement was false, or with reckless disregard as to whether it was false.
 {¶ 27} "Such reckless disregard may be established by clear and convincing evidence that the defendant proceeded to publication despite a `high degree of awareness of *** probable falsity,' or that `the defendant in fact entertained serious doubts as to the truth of his publication.'" Id. (Citations omitted.)
 {¶ 28} Moreover, "`reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated *Page 13 
before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.'" Id., quoting St. Amant v. Thompson (1968), 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed. 262.
 {¶ 29} Thus, the proper focus is solely on the defendant's state of mind "toward the truth or falsity of the statement alleged to be defamatory" at the time of publication. Varanese; St. Amant.
Accordingly, when a statement is supported by some basis in fact, courts have found insufficient evidence of actual malice even if the statement is ultimately found to be untrue. New York Times.
 Defamatory Statements at Issue {¶ 30} The first article at issue, dated August 26, 2005, is entitled "Workers' Comp Ignored Warning About Brokers' Fees." Plaintiffs argue that the following numbered statements establish evidence of actual malice.[5]
1) The article states that the BWC ignored a warning from the SEC that three investment firms, including Great Lakes, received "excessive fees" for their brokerage work for the BWC.
2) The article states that the "trio of BWC bond brokerages the SEC chose to review were no strangers to investment scandal." *Page 14 
 {¶ 31} On November 8, 2002, the SEC sent a letter to the BWC. In that letter, the SEC stated that particular commissions "appear[ed] to be excessive." In another letter written on March 17, 2004, the SEC wrote that there may be "possible abuse" and that the commissions "may be" excessive. The SEC also notified the BWC that the rates it paid were potentially high for everyone.
 {¶ 32} Plaintiffs argue that the SEC letter was speculative and that the BWC, the Attorney General's office, and Joseph Rice, the plaintiffs' spokesman, denounced the suggestion prior to the article's publication. They further allege that the word "scandal" ties one to criminal activity and there was no proof that they were involved in any criminal activity related to Tom Noe, Joe Deters ("Deters") or Terry Gasper ("Gasper").
 {¶ 33} The article states that White was a friend of Gasper's and that they were fellow alumni of St. Ignatius High School. The article also states that Gasper, who was forced to resign, was the BWC's former chief investment officer who failed to inform the BWC of the SEC's concerns.
 {¶ 34} However, "the mere presence of conflicting stories in a defendant's own files does not establish that the defendant knew that the [statement] was false, `since the state of mind required for actual malice would have to be brought home to the persons in *** the organization having responsibility for the publication [The Plain Dealer].'" Varanese at 81, quoting New York Times. *Page 15 
Furthermore, the "[f]ailure to investigate does not in itself establish bad faith." St Amant. Thus, we do not find that these statements show actual malice.
3) The article states, "Furthermore, the bureau allowed brokers like Great Lakes Capital Partners, U.S. Discount Brokerage Inc. and Mantor Watson Securities to designate their own commissions. And there was no evidence these brokers could handle large volume trades, the SEC said."
 {¶ 35} The Plain Dealer concedes that this is a misstatement because investment managers not brokers set the commissions. The plaintiffs argue that defendants knew about the word choice and printed it anyway. However, there is no evidence in the record that the statement was published with a high degree of awareness of its probable falsity. One of the writers of the article, Julie Smyth ("Smyth"), acknowledged the mistake in word choice but did not remember whether she wrote the sentence or how the mistake had occurred. Thus, we do not find that these statements were made with actual malice at the time they were published.
4) The article states, "The brokers were overpaid `without performing any real responsibilities or incurring any costs other than clearing fees for executing the trades,' the SEC said."
 {¶ 36} The plaintiffs argue that The Plain Dealer made unsubstantiated conclusions despite the fact that the SEC stated in its letter to the BWC that the comments were based only on the "staff's examination and are not findings or conclusions of the Commission." As such, the plaintiffs argue that The Plain Dealer *Page 16 
misconstrued the truth and "used `superheated language' to connect White and Great Lakes to wrongdoing."
 {¶ 37} We note that "a news report is considered a substantially accurate account of official government information or of a government report if the `gist' or the `sting' of the allegedly defamatory aspects of the news report taken as a whole accurately reflects the substance of the *** information obtained from official reports." Haynik v.Zimlich (C.P. 1986), 30 Ohio Misc.2d 16, 508 N.E.2d 195. Moreover, "[e]rrors as to secondary facts, that is, facts which do not change the import of the story or substantially alter the substance of the allegedly defamatory (but protected) aspect of the story, are not actionable." Id.
 {¶ 38} We find that these statements are substantially fair and accurate accounts of the statements made by the SEC in its letters. Thus, these statements are not defamatory.
5) The article states, "Great Lakes also worked for MDL Capital Management, another politically connected investment firm that employed the daughter of former bureau Oversight Commissioner George Forbes. MDL lost $215 million in bureau investments."
 {¶ 39} Plaintiffs argue that Great Lakes never "worked for" MDL. Rather they claim that Great Lakes "executed trades for MDL, just like dozens of other companies." Plaintiffs argue that this statement insinuates unsupported criminal activity. *Page 17 
 {¶ 40} For a statement to be defamatory under Ohio law, the "words must be of such a nature that courts can presume as a matter of law that they tend to degrade or disgrace the person of whom they are written or spoken, or hold him up to public hatred, contempt or scorn." Bram v. M.Weingold Co. (Mar. 30, 2000), Cuyahoga App. No. 76041, quotingMoore v. P.W. Publishing Co. (1965), 3 Ohio St.2d 183, 188,209 N.E.2d 412, cert. denied (1966), 382 U.S. 978, 15 L.Ed.2d 469, 86 S.Ct. 549.
 {¶ 41} In the instant case, it is the reader's perception of MDL's conduct, not the statement itself, that could potentially affect the plaintiffs' reputation. The statement that Great Lakes also worked for MDL makes no defamatory assertion regarding the plaintiffs' conduct. SeeFerreri v. Plain Dealer Publishing Co. (2001), 142 Ohio App.3d 629,756 N.E.2d 712. Thus, we do not find that this statement was made with actual malice.
 {¶ 42} The second article, dated November 18, 2005, is entitled, "BWC brokers turn up in New Hampshire scandal." It states that Theobold, the former chairman of the Board of the NHRS, was forced to resign after discovery that he had undisclosed dealings with companies involved with the NHRS. The plaintiffs take issue with the following statements or word choice, which we designate by letters:
 A) The word "scandal" that is used in the title and in the body of the article.
 B) "Excessive commissions" being paid to a trio of politically connected investment brokers (Great Lakes, U.S. Discount, and Mantor). *Page 18 
 C) The article states that, "***it emerged in press reports that a private business in which Theobold is a partner appeared to have had an association with Great Lakes Capital Partners two years before the Westlake firm landed a contract with the New Hampshire retirement system."
 {¶ 43} We do not find actual malice in these statements for the same reasons set forth in our discussion of statements 1, 2, and 4 of the August 26, 2005 article above.
 D) The articles states, "Both U.S. Discount and Raymond James, White's and Mantor's respective employers at the time, appeared on a short list of brokers at then-Ohio Treasurer Joe Deters' office. The list was central to a contributions-for-favors scheme in which three Deters associates were convicted."
 {¶ 44} The plaintiffs argue that The Plain Dealer would like its readers to believe that White is in some way involved in this "scheme" to do business in an "illegal" "set-up or an arrangement." However, we note that White did work for U.S. Discount. As we stated above, placing White's name in a position that does not appear favorable is not sufficient to constitute actual malice.
 {¶ 45} Having reviewed the two articles, we agree with the trial court in finding that the plaintiffs failed to establish by clear and convincing evidence that The Plain Dealer acted with actual malice and that The Plain Dealer's published statements were false statements of fact. The thrust of the plaintiffs' argument is that The Plain Dealer intentionally misstated information in the two articles despite having information that contradicted the two articles. These *Page 19 
allegations, if true, might raise an issue of negligence, but they do not demonstrate actual malice.
 {¶ 46} Accordingly, the first and second assignments of error are overruled. Statements Not Concerning the Plaintiffs
 {¶ 47} In the third assignment of error, the plaintiffs argue that the trial court erred in determining that some of the statements printed by The Plain Dealer did not concern them. The trial court in the instant case found that the following statements do not pertain to the plaintiffs and are not relevant to the defamation claim.
 1) "Worker's Comp ignored warning about broker's fees."
 2) "Former investment officers for the bureau hid the U.S. Securities and Exchange Commission warning from their superiors, bureau officials said."
 3) "A Plain Dealer analysis at the time identified Raymond James and U.S. Discount Brokerage among six firms that did 88 percent of the business at Deters' office."
 4) Patrick White worked for U.S. Discount Brokerage in 2001 when it was "entangled in the pay-to-play allegations that swept Republican State Treasurer Joe Deters' office in 2001" before he started Great Lakes in 2002.
 5) "Petro spokeswoman Kim Norris said the SEC has not responded to Petro's April 2004 letter, which disputed the SEC's findings."
 6) "It came to light in August that Petro declined to act when the SEC first identified the exorbitant BWC fees there years ago." *Page 20 
 7) "At the time of the initial warning, the BWC's investment operation was enjoying regular kudos for its achievements."
 {¶ 48} We note that in order to be actionable, a plaintiff in a defamation action must demonstrate that the alleged defamatory statement were "of and concerning" the plaintiff. New York Times. Thus, we agree with the trial court's finding that the above statements do not pertain to the plaintiffs' defamation claim.
 {¶ 49} Because the court was correct in considering only statements that specifically concern the plaintiffs in its analysis, we find that the third assignment of error lacks merit.
 Alleged Tortious Interference {¶ 50} In the fourth assignment of error, the plaintiffs argue that the trial court erred in granting summary judgment on their tortious interference with business and contractual relationships claims.
 {¶ 51} In order to establish tortious interference with a business relationship, a plaintiff must prove:
 "(1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages." Castle Hill Holdings, LLC v. Al Hut, Inc., Cuyahoga App. No. 86442, 2006-Ohio-1353, citing Brookeside Ambulance, Inc. v. Walker Ambulance Serv. (1996), 112 Ohio App.3d 150, 155-156, 678 N.E.2d 248. *Page 21 
 {¶ 52} In order to establish tortious interference with a contractual relationship, a plaintiff must prove:
 "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." Fred Siegel Co., L.P.A. v. Arter Hadden, 85 Ohio St.3d 171, 176, 1999-Ohio-260, 707 N.E.2d 853.
 {¶ 53} The plaintiffs argue that The Plain Dealer's knowledge that the articles were defamatory was sufficient to prove intent to interfere with the plaintiffs' business and contractual relationships. However, a review of the record reveals that the plaintiffs did not present any evidence that The Plain Dealer intentionally procured the contract's breach. Without such evidence, the plaintiffs have failed to establish a claim for tortious interference with business and contractual relationships. Thus, the trial court correctly entered summary judgment on the plaintiffs' tortious interference with business and contractual relationships claims.
 {¶ 54} Accordingly, the fourth assignment of error is overruled.
Judgment is affirmed.
It is ordered that appellees recover of appellants costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. *Page 22 
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., J., and CHRISTINE T. McMONAGLE, J., CONCUR
[1] Plaintiffs claim that Great Lakes was forced to cease operations in December 2006 because of the negative publicity from The Plain Dealer.
[2] The determination of whether a party is a private or public figure is a matter of law. Milkovich v. News-Herald (1984), 15 Ohio St.3d 292,294, 473 N.E.2d 1191.
[3] The plaintiffs argue that the statements in the two articles are "libelous per se." Statements are libelous per se if they accuse one of criminal activity or are injurious to one's trade or occupation.Fish v. Heatherdowns County Club Assn. (June 7, 1991), Lucas App. No. L-90-072. Because the plaintiffs argue that the two articles do both, they claim that malice and damages are presumed.
However, the presumption of actual malice was declared unconstitutional by the United States Supreme Court in New York TimesCo. v. Sullivan (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. See, also, Clark v. Plain Dealer Publishing Co. (Nov. 4, 1982), Cuyahoga App. No. 44544, where this court held that "constitutional law now requires that liability for any form of libel requires some degree of fault on the publisher" and Thomas H. Maloney Sons, Inc. v. E. W. ScrippsCo. (1974), 43 Ohio App.2d 105, 110, 334 N.E.2d 494, where this court held that an "individual bringing a libel suit based upon a publication which is defamatory on its face must prove not only the publication of such statement but also actual injury, and fault on the part of the publisher. Such fault may consist of either negligent failure to exercise due care, or a greater degree of fault such as express or actual malice."
[4] "Whether the evidence is sufficient to support a finding of actual malice is a question of law for the court to decide." Lansky at ¶ 19, citing Harte-Hanks Communications, Inc. v. Connaughton (1989),491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562.
[5] Plaintiffs also dispute several statements in the two articles that we find are not "of and concerning" the plaintiffs. Thus, these statements are not addressed in the defamation analysis but in our treatment of the third assignment of error. *Page 1