[Cite as *Anderson v. WBNS-TV, Inc.*, 2020-Ohio-6933.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Aaron Anderson et al., | : | |
| Plaintiffs-Appellants, | : | |
| | | No. 17AP-660 |
| v. | : | (C.P.C. No. 16CV-9809) |
| WBNS-TV, Inc., | : | (ACCELERATED CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on December 29, 2020

**On brief:** *Calig Law Firm, LLC*, and *Sonia T. Walker*; *Jones Law Group, LLC*, and *J. Michael Nicks*, for appellants. **Argued:** *Sonia T. Walker*.

**On brief:** *Zeiger, Tigges & Little LLP*, *Marion H. Little, Jr.*, and *Kris Banvard*, for appellee. **Argued:** *Marion H. Little, Jr.*

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Plaintiffs-appellants, Aaron Anderson; Aaronana Anderson; Willie Anderson, suing individually and as guardian of Arron Anderson; and Nanita Williams, suing individually and as guardian of Arron Anderson, appeal a judgment of the Franklin County Court of Common Pleas that granted summary judgment in favor of defendant-appellee, WBNS-TV, Inc. For the following reasons, we reverse that judgment with regard to plaintiffs' claim for defamation.

{¶ 2} On January 10, 2016, Jason A. Bolt, a detective with the Columbus Division of Police, prepared a "Media Information" report regarding a robbery that had occurred at the Fort Rapids Indoor Waterpark on November 26, 2015. (Ex. 1, Bolt Aff.) At the top of

the report, Detective Bolt indicated that the individuals the police suspected of committing the robbery were "[u]nknown," and Detective Bolt did not supply any identifying information, such as sex, race, or age, regarding the suspects. *Id.* In the narrative section of the report, Detective Bolt wrote:

> The victims were walking in the parking lot of Fort Rapids [W]aterpark watching their eight[-]year[-]old daughter ride her "hoverboard." The suspects approached her on foot, put a gun to the eight year old[']s head and demanded her hoverboard. The suspects then ran to a white PT [C]ruiser and fled out of the parking lot.
>
> Anyone that can help identify the persons in the attached photographs who may have been involved are asked to contact the Columbus Police Robbery Unit * * *. If they wish to remain anonymous[, they] can contact Central Ohio Crime Stoppers * * *.

*Id.*

{¶ 3} Bolt attached two black-and-white photographs to his report. The first photograph, which appears to come from a security camera, depicts multiple individuals standing in a mostly empty parking lot. However, the poor quality of the photograph and the lengthy distance between the individuals and the camera prevents any identification of the individuals' sex, race, or age. The second photograph, also from a security camera, shows three individuals—two men and one woman—entering a hotel hallway. In this photograph, the facial features of each individual are clearly visible.

{¶ 4} On January 20, 2016, the Columbus Division of Police emailed the Media Information report and two photographs to multiple media outlets, including WBNS. Relying on the Media Information report, WBNS staff wrote news items for WBNS' regular "CrimeTracker 10" news feature. According to the scripts provided by WBNS, the following newscast aired on January 21, 2016, at 5:00 a.m.:

> IN CRIMETRACKER 10
>
> * * * [Notes:show suspect pic]
>
> [C]olumbus Police hope you recognize these two men who robbed an 8-year-old girl at gunpoint!
>
> It happened in the parking lot of Fort Rapids [I]ndoor [W]aterpark in [C]olumbus.[Notes:show parking lot photo]

> Robbery detectives just-released surveillance images from the [N]ovember crime.
>
> The girl was riding her hoverboard in the parking lot with her family when they say two men pointed a gun at her head, taking it.
>
> [Notes:show suspect pic]
>
> Columbus Police say suspects-- seen here-- took off in a P-T [C]ruiser.

(Ex. 3, Gravely Aff.)

{¶ 5} An hour later, at 6:00 a.m., WBNS aired the following:

> New this morning....
>
> * * *
>
> An 8-year-old girl robbed at gunpoint-- for a popular toy.
>
> The robbery happened in the parking lot of Fort Rapids [I]ndoor [W]aterpark back in November.
>
> You can see the scene in these just released surveillance images.
>
> The girl was riding her hoverboard when robbers went up to her, [p]ut a gun to her head and took it.
>
> Columbus Police say suspects-- seen here-- took off in a P-T [C]ruiser.

(Ex. 2, Gravely Aff.)  As the anchor said the last line, WBNS showed the photograph of the three individuals entering the hotel hallway.[1]

{¶ 6} In additional to airing the two newscasts, WBNS also posted an article regarding the robbery on its website and Facebook page.  WBNS placed the hallway photograph directly underneath the headline "Robbers Put Gun to Child's Head and Steal

---

[1] There is confusion in the record regarding which newscast aired at 5:00 a.m. and which aired at 6:00 a.m. Michael Gravely, an assignment manager in WBNS' news department, testified that Exhibits 2 and 3 to his affidavit are true and accurate copies of the scripts for the 5:00 a.m. and 6:00 a.m. newscasts.  He, however, failed to specify which script was read at which time.  The title of Exhibit 3—"5:00am show 1/21/2016"— would seem to indicate that Exhibit 3 is the script of the 5:00 a.m. newscast, but Exhibit 2 is entitled "4:25am 1/21/2016," potentially making it the script of the earliest aired newscast.  Ultimately, the order in which WBNS aired the two news items does not create a genuine issue of material fact, so we recite the facts consistent with our best interpretation of the evidence.

Hoverboard." (Ex. 5, Gravely Aff.; Ex. 1, Pls.' Memo Contra Def.'s Mot. for Summ. Jgmt.) The article following the photograph stated:

> It happened Sunday, November 26, 2015 outside Fort Rapids Water Park around 10 PM.
>
> Police say the victim was riding her hoverboard while in the parking lot with her family when they were approached by two men. The suspects put a gun to the 8-year-old girl's head and demand[ed] the toy.
>
> When she handed it over, the two men ran to a white PT Cruiser and took off.
>
> Investigators say there was a woman with the two male suspects. They are not sure how she is connected to the robbery.
>
> No one was injured during the robbery.
>
> If you have any information about this incident, call Columbus Police * * * or make an anonymous tip to Central Ohio Crime Stoppers * * *.

*Id.*

{¶ 7} Nanita Williams was watching WBNS the morning of January 21, 2016, and she recognized her three children—Aaron, Aaronana, and Arron—as the individuals depicted in the hallway photograph. Williams became extremely upset, although her children assured her that they had not participated in the robbery. Apparently, the three Anderson siblings had visited Fort Rapids on the night of the robbery, but only to deliver Thanksgiving dinner to Aaronana's boyfriend, a Fort Rapids employee.

{¶ 8} Williams and her husband, Willie Anderson, took Aaron, Aaronana, and Arron to police headquarters to resolve the matter on the morning of January 21, 2016. Later that day, Detective Bolt issued the following update to all media outlets:

> Following the news coverage, the individuals in the video immediately came into Columbus Police Headquarters. The individuals in the video spoke to detectives, and, after further investigation, were found to not be the suspects in the robbery. Please discontinue the use of this video for any further reporting of this crime.

(Ex. 4, Bolt Aff.) After receiving this update, WBNS removed the hallway photograph from its website and Facebook page and replaced it with the parking lot photograph.

{¶ 9} On October 17, 2016, the Andersons filed a complaint against WBNS asserting defamation and other claims. WBNS answered the complaint and then moved for summary judgment. With regard to the defamation claim, WBNS argued it was entitled to summary judgment on the ground that the Andersons could not prove that WBNS acted with the requisite degree of fault in publishing the alleged defamatory statements. WBNS pointed out that its staff relied upon the Media Information report when drafting the newscasts and internet story. WBNS contended that it acted reasonably in relying on the Media Information report because the report originated from an official, law enforcement source and WBNS had no reason to suspect the report was inaccurate. WBNS, therefore, asserted that no reasonable trier of fact could find it negligent in determining the truth or falsity of its reporting.

{¶ 10} Although WBNS only attacked the Andersons' ability to prove the fault element, the Andersons' response to WBNS' motion for summary judgment addressed all elements of their claim for defamation. Specifically, with regard to the fault element, the Andersons argued that WBNS had acted negligently in publishing the newscasts and internet story because WBNS substantially altered the information contained the Media Information report. The Media Information report stated that the individuals in the hallway photograph—the Anderson siblings—were "persons * * * who may have been involved" in the robbery, but WBNS described the Anderson siblings as the people "who robbed an 8-year-old girl at gunpoint," and it published their photograph underneath the headline "Robbers Put Gun to Child's Head and Steal Hoverboard." (Ex. 1, Bolt Aff.; Ex. 3 & 5, Gravely Aff.) In short, the Andersons complained that they were, at most, suspects in the Media Information report, but WBNS' reporting transformed them into robbers. Based upon the disparity between the information contained in the Media Information report and WBNS' newscasts and internet story, the Andersons asserted that questions of fact remained regarding whether WBNS had acted reasonably in discerning the truth or falsity of its statements.

{¶ 11} Confusingly, the trial court did not address whether WBNS had altered the Media Information report to increase the Andersons' level of participation from mere possible involvement to actually committing the robbery, or whether the alleged alteration amounted to negligence with regard to truth or falsity. Instead, the trial court determined that WBNS was entitled to summary judgment because a reasonable reader would not

interpret its statements as defamatory. Although whether a statement is defamatory is an element of a claim for defamation, WBNS did not move for summary judgment on that element.

{¶ 12} The Andersons appealed to this court, assigning as error the trial court's "granting [of WBNS'] Motion for Summary Judgment on [the Andersons'] defamation claim where [the Andersons] provided clear and convincing evidence of [WBNS'] negligence." (Appellants' Brief at 1.) We reversed the entry of summary judgment on the defamation claim, finding there existed a genuine issue of material fact regarding whether WBNS had acted negligently in publishing the alleged defamatory statements. *Anderson v. WBNS-TV, Inc.*, 10th Dist. No. 17AP-660, 2018-Ohio-761, ¶ 11.

{¶ 13} WBNS appealed our decision to the Supreme Court of Ohio, and that court accepted the appeal for discretionary review. The Supreme Court determined that this court had not applied the fault standard set forth in *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176 (1987). *Anderson v. WBNS-TV, Inc.*, 158 Ohio St.3d 307, 2019-Ohio-5196, ¶ 14. The *Lansdowne* standard requires a showing, by clear and convincing evidence, "that the defendant failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication." *Lansdowne* at 180. The Supreme Court vacated our judgment and remanded the case to this court so we could again consider whether the trial court properly granted summary judgment to WBNS on the Andersons' defamation claim. *Anderson* at ¶ 14. On remand, we must apply the standard set forth in *Lansdowne. Id.*

{¶ 14} A trial court must grant summary judgment under Civ.R. 56 when the moving party demonstrates that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, LLC*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 15} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making conclusory allegations. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* If the moving party meets its burden, then the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293. If the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Dresher* at 293.

{¶ 16} "A defamation claim against a news organization requires proof that (1) the organization made a false statement, (2) the statement was defamatory, (3) the organization published the statement, (4) the plaintiff was harmed as a proximate result of the publication, and (5) the organization acted with the requisite degree of fault in publishing the statement." *Anderson* at ¶ 9. Here, we focus solely on the last element: whether WBNS acted with the requisite degree of fault.

{¶ 17} At common law, a defendant was strictly liable for publishing a defamatory statement unless he could show the statement was true or protected by some privilege. *Dale v. Ohio Civil Serv. Emps. Assn.*, 57 Ohio St.3d 112, 113-14 (1991). However, the United States Supreme Court imposed constitutional limitations on the common law of defamation in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). In that case, the court held that a public official could not recover damages for a defamatory falsehood relating to his official conduct unless he proved "actual malice," i.e., that the statement was made with knowledge that it was false or with reckless disregard of whether it was false. *Id.* at 279-80. By instituting an actual malice proof of fault requirement, the United States Supreme Court sought to prevent the chill on the exercise of free speech that resulted from the common law's strict liability approach to fault. *Id.* at 278 (holding that the common law, which did not require a plaintiff to prove fault, created a "pall of fear and timidity" under "which the First Amendment freedoms [could not] survive").

{¶ 18} Three years after deciding *New York Times*, the United States Supreme Court extended the rule articulated in that case to apply to public figures in addition to public

officials. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162-65 (1967) (Warren, C.J., concurring in the result). However, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345-46 (1974), the court refused to require the use of the actual malice standard in suits by private persons alleging defamation on matters of public concern. While the court again recognized that the common law induced self-censorship, it weighed that chilling effect against the states' legitimate interest in compensating individuals for the harm inflicted on them by a defamatory falsehood. *Id.* at 341-48. The court determined that, unlike public figures, private individuals have not voluntarily exposed themselves to increased risk of injury from defamatory statements and generally lack effective opportunities to rebut such statements. *Id.* at 344-45. Based on these two considerations, the court decided to give the states substantial latitude to enforce a legal remedy for defamatory statements regarding a public concern that are injurious to the reputation of a private individual. *Id.* at 345-46. The court held that, in such cases, the states could define for themselves an appropriate standard of liability, so long as they did not impose liability without fault. *Id.* at 347.

{¶ 19} The court, however, added an important caveat to its conclusion that the states could determine their own liability standard. The court stated:

> At least this conclusion obtains where, as here, the substance of the defamatory statement "makes substantial danger to reputation apparent." This phrase places in perspective the conclusion we announce today. Our inquiry would involve considerations somewhat different from those discussed above if a State purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential.

(Footnote omitted.) *Id.* at 348.

{¶ 20} Potentially, at least two types of fault can exist in the defamation context: fault regarding the truth or falsity of a statement and fault regarding danger to reputation. In *Gertz*, the Supreme Court was primarily concerned with the type of fault related to the truth or falsity of a statement. 1 Smolla, *Law of Defamation*, Section 3:97 (2d Ed. Nov.2019 Update). *Gertz* allowed the adoption of a substitute standard for the actual malice standard, which gauges a defendant's knowledge or reckless disregard as to a statement's falsity. Logically, then, the substitute standard, whether it be negligence or some higher standard, must also measure the defendant's fault with regard to the truth or falsity of the alleged defamatory statement.

{¶ 21} *Gertz*, however, also touched on fault regarding danger to reputation in the caveat indicating that the court may have reached a different conclusion had the defamatory nature of the statement not been apparent to a reasonable editor or broadcaster.  "Presumably, what prompted [the court's] caveat was the inconsistency between the reasonable care regime [regarding falsity that the court] envisioned and the possibility that a publisher might be held liable for a statement that he could not have known was defamatory.  * * * If the defendant could not have known that the publication posed a threat to reputation, he cannot, consistent with the principle of no liability without fault, be held accountable irrespective of any negligence or recklessness with respect to veracity."  Anderson, *Libel & Press Self-Censorship*, 53 Tex.L.Rev. 422, 463-64 (1975).  Thus, under *Gertz*, a plaintiff also has the burden of demonstrating that the content of the alleged defamatory statement would "warn a reasonably prudent editor or broadcaster of its defamatory potential."  *Gertz* at 348.  *See Ryan v. Herald Assn., Inc.*, 152 Vt. 275, 280 (1989), fn. 3, quoting *Gertz* at 348 ("The holding of *Gertz* applies only in situations where 'the substance of the defamatory statement "makes substantial danger to reputation apparent." ' "); *Gazette, Inc. v. Harris*, 229 Va. 1, 22 (1985) (recognizing that *Gertz* was limited to those circumstances where "the news item, under the circumstances, [w]ould warn a reasonably prudent editor of its defamatory potential").

{¶ 22} Subsequent to *Gertz*, Ohio adopted the ordinary negligence standard as the standard of liability for actions involving a private individual defamed in a statement about a matter of public concern.  *Embers Supper Club, Inc. v. Scripps-Howard Broadcasting, Inc.*, 9 Ohio St.3d 22, 25 (1984).  The Supreme Court of Ohio held that "the question which a jury must determine by a preponderance of evidence is whether the defendant acted reasonably in attempting to discover the truth or falsity or defamatory character of the publication."  *Id.*  Ohio, therefore, applies the negligence standard to determine the fault of the defendant in ascertaining both the truth or falsity and the defamatory character of a publication.  In this, Ohio is consistent with the Second Restatement of Torts and other states.  *See* Restatement of the Law 2d, Torts, Section 580B (1977); *Levine v. CMP Publications, Inc.*, 738 F.2d 660, 672 (5th Cir.1984) ("Texas law, in accordance with *Gertz*, defines the level of fault a private defamation plaintiff must prove in order to recover from a publisher as negligence, meaning the publisher knew or should have known the article

was false and that the content of the article would warn a reasonably prudent editor of its defamatory potential.").

{¶ 23} In *Lansdowne*, a plurality of the Supreme Court of Ohio heightened the preponderance-of-the-evidence standard of proof adopted in *Embers* to the clear-and-convincing-evidence standard. *Lansdowne*, 32 Ohio St.3d at 180. A majority of the court recognized the clear-and-convincing-evidence standard as the appropriate standard a year later. *Oney v. Allen*, 39 Ohio St.3d 103, 106 (1988), fn. 2.

{¶ 24} In the case at bar, WBNS argues it that acted reasonably in attempting to discover the truth or falsity of the newscasts and internet story because it based its reporting on a reliable, law enforcement source. The Andersons respond that a question of fact remains regarding whether WBNS acted reasonably because it altered the information contained in the Media Information report. The Andersons point out that the Media Information report refers to the Andersons as "suspects," but WBNS called them "men who robbed an 8-year-old girl at gunpoint" and intimated they were "[r]obbers." (Ex. 1, Bolt Aff.; Ex. 3 & 5, Gravely Aff.) According to the Andersons, WBNS was negligent as to the truth or falsity of its statements because it failed to compare the content of its stories to the Media Information report and recognize that it had published misleading information.[2]

{¶ 25} This is not a case where the police released a video or photograph of suspects committing a robbery and asked the public to identify the suspects depicted in the video or photograph. In such a case, the video or photograph itself evinces the suspects' participation in the robbery. Here, the police provided WBNS a photograph of the individuals who "may have been involved" in the robbery that showed them merely walking in a hallway. (Ex. 1, Bolt Aff.) Neither the Media Information report nor the hallway photograph established the individuals in the hallway photograph as "robbers." WBNS, nevertheless, displayed the hallway photograph while conveying the message that the individuals in the photograph—the Anderson siblings—had robbed an 8-year-old girl at gunpoint. Given that WBNS' reporting deviated from the information contained in the

---

[2] We reject WBNS' assertion, made during oral argument, that the Andersons waived this argument by not raising it in the trial court. In responding to WBNS' motion for summary judgment, the Andersons argued that "[WBNS] altered the information for what can only be considered sensationalism. * * * [T]his alteration *could* and *did* mislead Defendant's audience to believe that the individuals in the photograph were guilty of robbery. This alteration creates the degree of fault required to satisfy the only element challenged in Defendant's motion." (Emphasis sic.) (Pls.' Memo Contra Summ. Jgmt. at 6-7.) Later in the memorandum contra, the Andersons asserted, "[a]s to the [fault] element, Defendant failed to act reasonably by substantially altering the Media Report * * *." *Id.* at 8.

Media Information report, we conclude that a question of fact remains regarding whether WBNS acted reasonably to ensure the accuracy of its reporting.

{¶ 26} WBNS does not directly contest this conclusion; instead, it asserts that it should prevail because the statements at issue are not defamatory. As we stated above, to recovery on a defamation claim, a plaintiff must establish that a statement is defamatory. *Anderson*, 158 Ohio St.3d 307, 2019-Ohio-5196, at ¶ 9. WBNS, however, did not move for summary judgment on that element. It only moved for summary judgment on the fault element. Consequently, we surmise that WBNS is instead arguing that it did not act negligently in ascertaining the defamatory potential of its newscasts and internet story. That argument fits within the sole ground on which WBNS moved for summary judgment.

{¶ 27} A statement is defamatory if it tends to injure a person's reputation or exposes him or her to public hatred, contempt, ridicule, shame, or disgrace. *Great Lakes Capital Partners Ltd. v. Plain Dealer Publishing Co.*, 8th Dist. No. 91215, 2008-Ohio-6495, ¶ 15; *Heidel v. Amburgy*, 12th Dist. No. CA2002-09-092, 2003-Ohio-3073, ¶ 14; *Gupta v. Lima News*, 139 Ohio App.3d 538, 546 (3d Dist.2000). In the case at bar, WBNS essentially argues that, at most, its statements only identified the Andersons as suspects in the armed robbery of an eight-year-old girl, and no reasonable broadcaster could foresee the defamatory potential of naming someone a suspect in such a crime. We do not agree. Robbing a child at gunpoint for the child's toy is reprehensible behavior. Consequently, publicly identifying individuals as suspects in such a crime conceivably invites public hatred, contempt, ridicule, shame, and disgrace as to those individuals. *See Lawrence v. Bauer Publishing & Printing Ltd.*, 89 N.J. 451, 459 (1982) ("The statement that plaintiffs 'may be' charged with criminal conduct diminishes their standing in the community and is little different from an assertion that plaintiffs have actually been charged with certain crimes."). Thus, a question of fact remains regarding whether the harmful potential of WBNS' statements should have been apparent to a reasonable broadcaster.

{¶ 28} After review upon remand from the Supreme Court of Ohio, we sustain the sole assignment of error to the extent it alleges that the trial court erred in granting summary judgment to WBNS on the defamation claim. We determine that questions of fact remain, precluding summary judgment. We reverse the judgment of the Franklin

County Court of Common Pleas with regard to the defamation claim, and we remand this cause to the trial court for further proceedings consistent with law and this decision.

*Judgment reversed in part; case remanded.*

LUPER SCHUSTER and BRUNNER, JJ., concur.

———————————